IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-00085-01-CR-W-DGK |
| | ) | |
| EDWARD J. ALBERTY, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Evidence and Statements. (Doc #26) For the reasons set forth below, it is recommended that the motion be denied.

I. BACKGROUND

On March 10, 2015, a criminal complaint was filed charging defendant Edward J. Alberty with being a felon in possession of a firearm. (Doc. #1)

On March 25, 2015, the Grand Jury returned a one-count indictment against defendant Alberty. (Doc. #10) The indictment charges that on March 9, 2015, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed, in and affecting interstate commerce, a Hi-Point 9mm semi-automatic handgun Serial Number P1829140. (Doc. #10)

On December 21, 2015, defendant filed a motion to suppress arguing that police did not have reasonable suspicion to stop Mr. Alberty. (Doc #26) An evidentiary hearing on the motion to suppress was held on February 10, 2016. Defendant Alberty was represented by Assistant

Federal Public Defender Carie Allen. The Government was represented by Assistant United States Attorney Joseph M. Marquez. The sole witness called to testify at the suppression hearing was Officer Alexander Skinner.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On March 9, 2015, Officer Patrick Lewis and Officer Alexander Skinner were working as patrol officers for the Center Patrol Division of the Kansas City, Missouri Police Department. (Tr. at 3, 9) At approximately 6:16 pm, Officers Lewis and Skinner were dispatched to the Family Dollar located at 4601 Brush Creek, Kansas City, Missouri due to a disturbance call. (Tr. at 3)

2. Upon arriving at Family Dollar, the officers were informed by an employee of the store that the employee witnessed a man arguing with a woman outside the store and the man then entered the store and yelled racial slurs and threatened the employee. (Tr. at 4, 19, 31-32) The employee stated that the man said "I am sick of you messing with our black girls." (Tr. at 32) The employee informed Officer Skinner that the man placed his hands down his pants multiple times, which made the employee feel threatened. (Tr. at 4) According to Officer Skinner the employee "would say that [the man] was reaching down into his pants like he might have something. [The employee] didn't know what though. And [the employee] kind of took that as sort of a threat towards him, his person." (Tr. at 32) The employee did not report that the man assaulted the woman nor was he trying to take anything from the store or otherwise rob the store. (Tr. at 19) Officer Skinner testified that the employee felt the man had a weapon due to the man reaching down his pants and his statement that he was not afraid to go to jail. (Tr. at 32, 33) The employee described the man as a "black male, approximately 5'7", 5'8" wearing a gray T-shirt, wearing dirty blue jeans and had a stocky build and was also bald." (Tr. at 4) The employee did not see a weapon, nor did the man threaten to use a weapon. (Tr. at 20) According to Officer Skinner, the officers were at the store for approximately five minutes. (Tr. at 4)

3. Officers Skinner and Lewis decided to canvas the area for the man, in part because the employee "felt that the person may have had a weapon was very upset[.]" (Tr. at 4) According to Officer Skinner, the employee also wanted the officers to inform the man that he was trespassing and not to come back to the store. (Tr. at 4) Officers felt that the man could have been a danger and did not want him going back to the Family Dollar. (Tr. at 33) Officers also wanted to

2

determine what the cause of the issue was and whether the man was under the influence or had any weapons. (Tr. at 33)

4.    Upon leaving the Family Dollar, the officers conducted a canvas of the area. (Tr. at 4)  Officers observed an individual meeting the description provided by the employee about half a block from the store. (Tr. at 5)  The individual, later identified as Edward Alberty, was walking northbound on Forest Avenue crossing over Brush Creek Boulevard. (Tr. at 5)  Mr. Alberty was in the middle of crossing the street, but officers could not determine from which corner of Forest Avenue he began his path. (Tr. at 23)  At the time officers were driving eastbound on Brush Creek. (Tr. at 5)  Officers passed just south of Mr. Alberty on Brush Creek Boulevard. (Tr. at 23)  The officers decided to conduct a pedestrian check on Mr. Alberty. (Tr. at 5)  In order to stop Mr. Alberty, the officers had to turn their patrol car around and head back west on Brush Creek Boulevard. (Tr. at 5)  At the same time Officers Lewis and Skinner approached Mr. Alberty, Sergeant Ackerson was facing south in the area of 45th and Forest Avenue and captured some of the events on his dashcam recorder. (Tr. at 16)

5.    Mr. Alberty was not impeding traffic as he crossed the street. (Tr. at 27)  There were no traffic signals or marked crosswalk at Forest Avenue and Brush Creek Boulevards. (Tr. at 27)  As evidenced by Defense Exhibits 2 (Google map of the intersection) and 4 (image capture from Sgt. Ackerson's dashcam), Forest Avenue is not a straight road as it crosses Brush Creek. (Def. Ex. 2 & 4)  Instead, the road jogs to the east. (Tr. at 27-28)

6.    Upon activating the patrol car lights and stopping the car, Officer Skinner ordered Mr. Alberty to come over to the patrol car and place his hands on the patrol car. (Tr. at 6)  Officer Skinner had Mr. Alberty place his hands on the car and Officer Skinner immediately frisked him. (Tr. at 6, 21)  According to Officer Skinner he did so for officer safety purposes. (Tr. at 6)  During the frisk, Officer Skinner felt what he believed to be a handgun in Mr. Alberty's front left pocket and Mr. Alberty was immediately handcuffed. (Tr. at 6)  Mr. Alberty's pants were on backwards. (Tr. at 13-4)  Officer Skinner informed Mr. Alberty that he was being arrested for being in the street where a sidewalk is provided. (Tr. at 7)  After placing Mr. Alberty in custody, Officer Skinner returned to search the front left pocket and found a loaded .9 millimeter Hi-Point Luger handgun. (Tr. at 7)  At that time, officers also obtained Mr. Alberty's identity. (Tr. at 7)  While the officers were clearing the weapon and gathering information from Mr. Alberty, Mr. Alberty stated that "I'll just go to jail, I shouldn't have that." (Tr. at 9)  The officers had the Violent Crimes or Robbery Unit run Mr. Alberty's name to determine whether he was a felon, and it was determined that Mr. Alberty was a felon. (Tr. at 9)  Officers then informed Mr. Alberty that he was under arrest for suspicion of felon in possession of a firearm. (Tr. at 9)

7.      Officers then searched Mr. Alberty, incident to arrest, and found a small amount of marijuana. (Tr. at 10)  Mr. Alberty was cited for being in the street where a sidewalk is provided and possession of marijuana. (Tr. at 10)

## III.  <u>DISCUSSION</u>

Defendant Alberty seeks to suppress all evidence and testimony relating to evidence obtained during the stop and search of defendant on March 9, 2015. (Doc #26)  Specifically, defendant argues that because he was merely crossing the street and not violating any municipal ordinance, the officers had no reasonable suspicion and the search was therefore illegal. (<u>Id.</u> at 2-3)  Defendant argues that he did not fail to yield to any vehicles, was not crossing the road diagonally, and was not required to use a crosswalk because there was no such crosswalk present, and therefore his conduct was not illegal. (<u>Id.</u> at 2-4)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …." U.S. Const. amend. IV.  "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." <u>Terry v. Ohio</u>, 392 U.S. 1, 8-9, 88 S. Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).  Stop and frisks by police officers are "a substantial invasion of an individual's interest to be free from arbitrary interference by police." <u>U.S. v. Hughes</u>, 517 F.3d 1013, 1018 (2008).  Such an intrusion, however, is warranted where "the police officer [is] able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21.

Reasonable suspicion may be obtained from a variety of behaviors and circumstances, including unprovoked flight or where an individual "'matches the description of a person

4

involved in a disturbance near in time and location to the stop.'" United States v. Gilliam, 520 F.3d 844, 846 (8th Cir. 2008) (citing United States v. Hicks, 531 F.3d 555, 558 (7th Cir. 2008)). Officers may also rely on information obtained by a third party, if the reliability of the informant has been established. Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 1924, 32 L. Ed. 2d 612 (1972). In determining whether there is a specific, objective basis for an intrusion upon an individual, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . . ." United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 750-51, 151 L. Ed. 2d 740 (2002). Courts reviewing such intrusions must do so by asking whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.] Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." Terry 392 at 21-22 (citations omitted).

Officers may detain an individual upon reasonable, articulable suspicion that criminal activity may be afoot. Id. at 25-31; United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010). Officers who witness an individual violating the law, even if it is a simple misdemeanor or municipal ordinance violation, are permitted under Terry to detain that individual, even if it is to just to warn that individual that such conduct is in violation of the law. United States v. Banks, 553 F.3d 1101, 1104 (8th Cir. 2009).

Once an officer has performed a valid stop under Terry, an officer may frisk that individual as long as the officer can "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct.

Case 4:15-cr-00085-DGK   Document 40   Filed 04/04/16   Page 5 of 11

1889, 1903, 20 L.Ed.2d 917 (1968). The search "must be conducted in the least intrusive means reasonably necessary to dispel the risk of danger to the officers." Gilliam, 520 F.3d at 847-48 (citations omitted).

In determining whether officers had reasonable suspicion to detain Mr. Alberty, this Court must first identify the reasons for the stop. In the instant case, two reasons have been suggested. The first purported reason is the officers' belief that Mr. Alberty was in violation of a municipal ordinance barring individuals from walking in the street where a sidewalk is provided. The second reason for the stop was due to the conduct occurring at the Family Dollar. This Court will therefore determine whether either of those reasons provided reasonable suspicion that criminal activity was afoot.

A. Municipal Ordinance Violation

With regard to Mr. Alberty's conduct when he crossed Brush Creek Boulevard, it is important to note that Forest Avenue does not line up as it crosses Brush Creek Boulevard. (Tr. at 29) The southeast corner of the intersection lines up with the middle of Forest Avenue as Forest Avenue continues north past Brush Creek Boulevard. Therefore, if an individual crosses at the southeast corner of the intersection that individual would be in the middle of Forest Avenue; and once the individual crosses Brush Creek Boulevard, the individual would have to veer to the right or left to get back onto a sidewalk. (Tr. at 29)

The officers believed that Mr. Alberty was in violation of section 70-786 of the Code of Ordinances for the City of Kansas City, Missouri. Section 70-786 states, in part, "[w]here a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." Clearly, this ordinance was meant to indicate that where a

6

sidewalk runs parallel to a street, a pedestrian must utilize the sidewalk.

While the government does not argue that Mr. Alberty was in violation of section 70-783, it is important to explore section 70-783 in order to better understand the situation in which Mr. Alberty found himself. Section 70-783 details the manner in which a pedestrian is to cross a roadway. It states:

> (a) Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.
>
> (b) Any pedestrian crossing a roadway at a point where a pedestrian tunnel or overhead pedestrian crossing has been provided shall yield the right-of-way to all vehicles upon the roadway.
>
> (c) Between adjacent intersections at which traffic control signals are in operation, pedestrians shall not cross at any place except in a marked crosswalk.
>
> (d) No pedestrian shall cross a roadway intersection diagonally unless authorized by official traffic control devices. When authorized to cross diagonally, pedestrians shall cross only in accordance with the official traffic control devices pertaining to such crossing movement.

70-783.

In the instant case, Mr. Alberty was crossing the street when the officers first saw him. Thus, section 70-783 controls Mr. Alberty's conduct at that time. Officer Skinner testified that there was no traffic control device at the intersection, nor was there a marked crosswalk. (Tr. at 27) None of the above directives provides a clear description of how Mr. Alberty was to cross an intersection which does not line up. Therefore, Mr. Alberty was forced to utilize his best judgment in determining what manner to cross the intersection. Officers did not observe Mr. Alberty begin to cross the intersection. The testimony elicited, however, is consistent with someone crossing the intersection from the southeast side to the northeast corner.

7

Once Mr. Alberty crossed the intersection, section 70-786 governed his conduct since a sidewalk was provided. The only evidence that Mr. Alberty was walking in the middle of Forest Avenue is that of Officer Skinner. Toward the end of his testimony, Officer Skinner stated that "it appeared that he was walking just directly in the middle of the intersection and then he continued his walk northbound into Forest maintaining it." (Tr. at 35, 37) The dashcam video from Sgt. Ackerson does not clearly indicate whether Mr. Alberty continued to walk in the middle of Forest Avenue after crossing Brush Creek Boulevard. (Gov. Exhibit 2) In fact, Sgt. Ackerson's dashcam video shows Mr. Alberty on the sidewalk when officers first approached Mr. Alberty. (Gov. Ex. 2; Tr. at 30) The dashcam video from Officer's Skinner's car similarly does not show whether Mr. Alberty was in fact walking in the middle of Forest Avenue. (Gov. Ex. 2)

Prior to the dashcam video being played, Officer Skinner testified that at the time officers conducted the pedestrian check, Mr. Alberty was veering east toward the side of the road. (Tr. at 6) Officer Skinner also stated that that it appeared Mr. Alberty was moving in the direction of the northeast corner of Brush Creek Boulevard and Forest Avenue. (Tr. at 23) Upon cross-examination, Officer Skinner testified that Mr. Alberty was either on the grass by the sidewalk or on the sidewalk when he and Officer Lewis first approached Mr. Alberty. (Tr. at 30) Officer Skinner further testified that "[b]y the time we were turning around, he was leaving the street towards the side[walk]." (Tr. at 31)

Officer Skinner marked Defendant's Exhibit 2, which was a Google map of the area, to show were Mr. Alberty was located when officers first saw him and his path onto the sidewalk/grassy area parallel to Forest Avenue. (Tr. at 22, 34, 36) Officer Skinner's marks

indicate that Mr. Alberty walked north over Brush Creek Boulevard and veered to the east. (Def. Ex. 2)  Officer Skinner's markings further indicate that Mr. Alberty path led him to the sidewalk that parallels Brush Creek Boulevard on the north-eastside. (Def. Ex. 2)   His markings are inconsistent with his testimony that Mr. Alberty continued to walk north on Forest Avenue after crossing Brush Creek Boulevard. (Tr. at 37)

Officer Skinner testified that officers turned and watched Mr. Alberty as officers passed him on Brush Creek Boulevard and it appeared that Mr. Alberty continued along his path until he saw the officers turn their patrol car around to talk with him. (Tr. at 35)  Such conduct, however, is also consistent with a pedestrian crossing the street at that particular intersection.  As stated above, an individual crossing from the southeast corner would appear to be walking in the middle of Forest Avenue and would then have to veer to the right to get onto the sidewalk adjacent to Forest Avenue.

This Court does not have a clear indication that Mr. Alberty was in fact in violation of section 70-786.  As detailed above, Officer Skinner's testimony is inconsistent with regard to where Mr. Alberty was when officers initially stopped him.  This Court has reviewed both dashcam videos of the incident and neither video clearly shows Mr. Alberty walking in the street on Forest Avenue.  In fact, viewing the dashcam video reveals that as officers turn their patrol car around, Mr. Alberty can be seen either on or very close to the sidewalk at the northeast corner of the intersection. (Gov. Ex. 2)  When officers stop Mr. Alberty, Mr. Alberty is clearly not on the street. (Gov. Exhibit 2; Def. Ex. 4)  Therefore, this Court finds that officers did not have probable cause, nor reasonable suspicion, to stop Mr. Alberty for walking in the street where a sidewalk was provided.

9

B.  Disturbance at Family Dollar

The police were called to Family Dollar due to a disturbance at the store. (Tr. at 3)
Officers quickly obtained a description of the individual and what occurred at the store. (Tr. at 3-
4)  At this point, all the officers were aware of was that 1) there was a disturbance at the Family
Dollar involving an individual yelling racial slurs, 2) the individual's language suggested that he
had spent some time in jail[1], 3) the employee felt threated due to the individual's behavior of
placing his hands down his pants.

As previously noted, officers may utilize information obtained from third parties or
informants in determining whether they have reasonable suspicion or probable cause. Adams,
407 U.S. at 147.  In the instant case, the information was obtained by a store employee where the
risk of erroneous information is lessened. See United States v. Robinson, 670 F.3d 874, 876 (8th
Cir. 2012) (finding that "[g]iven the security guard's position and responsibility to his employer,
the risk that he will pursue a private agenda or embarrass an honest patron is smaller than when a
previously unknown citizen provides a tip.").   Thus, because Mr. Alberty matched the
description of the individual causing the disturbance at the Family Dollar, officers had the
requisite suspicion in order to perform a valid Terry stop. See Gilliam, 520 F.3d at 846 (officers
have reasonable suspicion to detain an individual where that individual meets the description of
an individual involved in a recent disturbance near the location).

Normally, that does not end our analysis.  In order to conduct a frisk, the officers had to

---

[1]  This Court has reviewed the dashcam video from Officer Skinner's car, which contains audio
of what transpired during the interview at Family Dollar.  While the audio is not always clear,
this Court was unable to identify any mention of the individual stating he was not afraid to go to
jail.  It is possible that such information was reported during the 911 call.  However, transcripts
of the 911 call were not submitted to this Court.  Nor was there any testimony of what officers
were told by dispatch.

have reasonable suspicion that Mr. Alberty was armed and dangerous. <u>Sibron</u>, 392 U.S. at 64. In determining whether the officers had reasonable suspicion, courts must determine whether a "'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" <u>Horton</u>, 611 F.3d at 940-41 (citing <u>Terry</u>, 392 U.S. at 27). However, the motion to suppress challenged only the stop and not the frisk. Because no evidence or argument was offered as to the reasonable of the frisk, the Court need not address whether the officers in this case were reasonable in conducting a frisk of defendant following the <u>Terry</u> stop.

## IV. <u>CONCLUSION</u>

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order DENYING defendant Edward J. Alberty's Motion to Suppress Evidence and Statements (Doc #26).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

11